Slip Op. 13-45

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CUTTER & BUCK, INC.,<br><br>                      Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>                      Defendant. | Before: Richard W. Goldberg, Senior Judge<br>Court No. 04-00624 |

**OPINION AND ORDER**

[Summary judgment granted for Defendant; summary judgment denied for Plaintiff; case dismissed in part for lack of jurisdiction.]

Dated: April 3, 2013

*Taylor Pillsbury*, Meeks, Sheppard, Leo & Pillsbury, of Newport Beach, CA, argued for plaintiff.

*Amy M. Rubin*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, and *Barbara S. Williams*, Attorney in Charge, International Trade Field Office. Of counsel on the brief was *Yelena Slepak*, Office of Assistant Chief Counsel for International Trade Litigation, U.S. Customs and Border Protection, of Washington, DC.

      Goldberg, Senior Judge: Cutter & Buck ("C&B") and the United States have filed cross-motions for summary judgment. C&B contests the U.S. Customs and Border Protection's ("Customs") valuation of 168 entries of apparel. Specifically, C&B asserts that Customs improperly failed to adjust the transaction value of each entry downward by deducting international freight charges. C&B requests that the court enter summary judgment in its favor and direct Customs to reliquidate the subject entries with a duty allowance. The Government claims that the Court lacks jurisdiction over five of the 168 entries and that Customs properly

declined a duty allowance with respect to the remaining entries. For the following reasons, the court grants the Government's summary judgment motion.

# BACKGROUND

Between July 2002 and March 2003, C&B entered 168 shipments of apparel into the Port of Seattle. Pl.'s Corrected Statement of Material Facts as to Which There is No Genuine Issue to Be Tried ("Pl.'s Facts") ¶ 2. Those particular entries were late shipments and not shipped in the manner C&B and seller had originally contemplated (i.e., free on board ("FOB")).[1] *See id.* ¶ 3. Instead, the shipments were governed by the provisions of a late delivery clause contained in C&B's purchase orders. *Id.* ¶¶ 4–5. The pertinent portion of the clause shifted freight responsibility from C&B to the seller, but did not otherwise expressly change the terms of sale from FOB to cost and freight ("CFR")[2] or provide for a reduction in the price of the goods. *See* Pl.'s Mot. and Mem. in Supp. of Summ. J. ("Pl.'s Br.") at Ex. A.

Upon importation, C&B paid the original FOB purchase price and claimed a deduction in the transaction value[3] of each shipment on the basis that the "price actually paid or payable" included international freight charges. *See id.* at 2. The applicable statute authorizes the deduction of international freight charges from the "price actually paid or payable" in certain defined circumstances. 19 U.S.C. § 1401a(b)(4) (2006). However, Customs found that a deduction was unwarranted and disallowed C&B's claimed deduction. Pl.'s Br. at 2.

---

[1] FOB is one of multiple Incoterms referenced in the briefing in this case. An Incoterm is "[a] standardized shipping term, defined by the International Chamber of Commerce, that apportions the costs and liabilities of international shipping between buyers and sellers." *Black's Law Dictionary* 835 (9th ed. 2009). According to the Incoterms, FOB "means that the seller delivers the goods on board the vessel nominated by the buyer at the named port of shipment or procures the goods already so delivered. The risk of loss of or damage to the goods passes when the goods are on board the vessel, and the buyer bears all costs from that moment onwards." Int'l Chamber of Commerce, *Incoterms 2010*, at 87 (2010) ("*Incoterms 2010*").

[2] CFR "means that the seller delivers the goods on board the vessel or procures the goods already so delivered. The risk of loss of or damage to the goods passes when the goods are on board the vessel. The seller must contract for and pay the costs and freight necessary to bring the goods to the named port of destination." *Incoterms 2010*, at 95.

[3] Transaction value is the preferred method for appraising imported merchandise. The transaction value is defined as the "price actually paid or payable for the merchandise when sold for exportation to the United States" with certain enumerated additions and deductions. 19 U.S.C. § 1401a(b). In this case, C&B claims a deduction.

   C&B then filed thirteen protests and subsequent requests for review challenging Customs's appraisement of the 168 entries.  *See* Def.'s Statement of Additional Material Facts as to Which There Are No Genuine Issues to Be Tried ("Def.'s Facts") ¶ 3.  In response to one of the applications for further review, Customs issued HQ 548432 (May 20, 2004).  In that ruling, Customs found that the "evidence did not show there was a change in the terms of sale from FOB to CFR" and denied the protest.  *Id.*  According to Customs, such a shift was necessary because Customs treats freight costs as *separate* from a FOB price, but *included* in a cost, insurance, freight ("CIF") or CFR price.  Therefore, freight deductions are available for CIF and CFR transactions and not for FOB transactions.  Because Customs believed the totality of the circumstances did not support a shift in the terms of the sale, a duty allowance was unwarranted.

   In the instant action, C&B argues that the undisputed facts demonstrate that C&B and the seller intended to effect a change to the purchase price and create a *de facto* CFR transaction.  The Government avers that the facts support Customs's finding that a deduction was unavailable.

## STANDARD OF REVIEW

   Summary judgment is available when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT R. 56(a).  A fact is material if it could affect the outcome of the action.  *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A factual dispute is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party."  *Id.* at 248.

   The Court reviews legal aspects of Customs's protest denials *de novo*.  28 U.S.C. § 2640(a)(1).  On *de novo* review, the Court accords deference to Customs's rulings "in proportion to their 'power to persuade.'"  *Michael Simon Design, Inc. v. United States*, 501 F.3d 1303, 1305 (Fed. Cir. 2007) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)); *see also*

*Peerless Clothing Int'l, Inc. v. United States*, 33 CIT __, __, 602 F. Supp. 2d 1309, 1315 (2009). The degree of deference accorded "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

## **SUBJECT MATTER JURISDICTION**

C&B challenges the denial of its thirteen protests covering the 168 disputed entries in this case. Neither the Government nor C&B contest the Court's jurisdiction over 163 of the entries. Accordingly, as to those 163 entries, jurisdiction is proper pursuant to 28 U.S.C. § 1581(a).

As to the remaining five entries, further analysis is necessary. The Government avers that C&B's alleged failure to timely protest Entry Numbers WC4-5003386-3, WC4-5003406-9, WC4-5003501-7, WC4-5003502-5, and WC4-5003503-3 deprives this Court of jurisdiction over those appeals. Def.'s Cross-Mot. for Summ. J. ("Def.'s Br.") at 5–8. C&B submits that Protest Number 3001-03-100211 was timely filed, and in support offers a FedEx overnight airbill dated one day before expiration of the ninety-day protest period. *See* Pl.'s Resp. Br. in Opp'n to Def.'s Cross-Mot. for Summ. J. ("Pl.'s Resp. Br.") at Ex. B. C&B asserts that it lacks more proof because Customs did not notify C&B of a timeliness problem as required by 19 C.F.R. § 174.30. *Id.* at 3. Due to this procedural irregularity, C&B requests that the court disregard the jurisdictional argument. *Id.* at 3–4.

This court has previously found that it may set aside government action violative of 19 C.F.R. § 174.30 when the party complaining of the errors is prejudiced. *See Sea-Land Serv., Inc. v. United States*, 14 CIT 253, 257, 735 F. Supp. 1059, 1063 (1990). Thus, addressing C&B's

arguments involves inquiry into (1) whether C&B received adequate notice of the reasons for the protest denial, and (2) if not, whether Customs's notification deficiencies prejudiced C&B.

C&B did not receive the notice mandated by law. 19 C.F.R. § 174.30 and its statutory counterpart, 19 U.S.C. § 1515, require that a protest denial include "a statement of the reasons for the denial, as well as a statement informing the protesting party of the right to a civil action contesting the denial of the protest." The protest denial at issue referred C&B to its previous ruling in HQ 548432, but did not state that the protest was untimely. *See* Pl.'s Resp. Br. at Ex. C. Further, Customs did not check the box on the protest form reserved for untimely filed protests. *Id.* The law requires that Customs identify *the reasons* for the denial, and by merely identifying *a reason*, Customs fell short of its notification burden.

Nonetheless, Customs's procedural shortcomings did not prejudice C&B. When C&B filed its summons in December 2004, it needed to establish this Court's jurisdiction over each protest. *See Global Sourcing Grp., Inc. v. United States*, 33 CIT __, __, 611 F. Supp. 2d 1367, 1372 (2009); *VWP of Am., Inc. v. United States*, 30 CIT 1580, 1584 (2006). Customs indicated that it received the protest in question on October 17, 2003—one day after the expiration of the ninety-day protest window. Pl.'s Resp. Br. at Ex. C; *see also* 19 C.F.R. § 174.12(e). Since the Customs receipt date is considered the protest file date, C&B should have noted any discrepancy when it filed its summons. *See* 19 C.F.R. § 174.12(f). At that point, it still could have pulled shipping records to establish the protest's timeliness. In sum, although Customs did not fulfill its duty in this case, Customs's failure did not relieve C&B of its own duty to verify the jurisdictional basis for its action.

C&B has not met its burden of proving jurisdiction over the five contested entries. Customs officials enjoy a presumption of correctness when performing their duties. *See*

*Prosegur, Inc. v. United States*, 25 CIT 364, 367, 140 F. Supp. 2d 1370, 1375 (2001). The sole document C&B offers to rebut that presumption is a FedEx airbill, but there is no guarantee that the protest was mailed on the date specified on the airbill or that Protest No. 3001-03-100211 accompanied the airbill. Thus, the Court is without jurisdiction over five of the entries covered by that protest.

## **DISCUSSION**

Turning to the substantive issue in this case, C&B argues that Customs erred by imposing a "heightened standard" on C&B when C&B attempted to claim a duty allowance. Pl.'s Br. at 9. According to C&B, Customs based its denial of the duty allowance on the fact that the terms of trade did not expressly change from FOB to CFR. *Id.* C&B asserts that isolated reliance on those Incoterms was improper since the totality of the circumstances otherwise demonstrated an intent to deduct air freight from the price actually paid or payable. *Id.* at 12. The Government denies that Customs focused exclusively on the Incoterms and instead argues that the totality of the circumstances weighed against a freight deduction. Def.'s Br. at 9.

In addressing the parties' arguments, the court begins with the statutory provision governing freight deductions. The plain language of 19 U.S.C. § 1401a(b), combined with persuasive case law and Customs rulings interpreting that provision, establish a framework for the court when examining the undisputed facts in this case. Based upon a review of applicable law and the facts of the instant case, the court finds that Customs properly rejected C&B's attempts to claim a freight deduction and that summary judgment in the Government's favor is appropriate.

## I.    Relevant legal framework

### A.  Statutory restraints on the deduction of freight charges

19 U.S.C. § 1401a(b) defines transaction value as the "price actually paid or payable for the merchandise when sold for exportation to the United States." The "price actually paid or payable" is defined as

> the *total payment* (whether direct or indirect, and *exclusive of any costs, charges, or expenses incurred for transportation, insurance, and related services* incident to the international shipment of the merchandise from the country of exportation to the place of importation in the United States) *made, or to be made*, for imported merchandise *by the buyer to, or for the benefit of, the seller*.

*Id.* § 1401a(b)(4)(A) (emphasis added). As that definition makes clear, the price the buyer paid for the merchandise must have either directly or indirectly included transportation costs for those costs to be excludable. Absent such evidence, a freight deduction is unavailable.

### B.  The court's prior guidance on the deduction of freight charges

Although case law interpreting the contours of 19 U.S.C. § 1401a(b)(4)(A) is sparse, this court has previously considered the effect of a late delivery agreement on an importer's ability to claim a deduction. *See Esprit de Corp v. United States*, 17 CIT 195, 817 F. Supp. 975 (1993). In *Esprit*, an importer and a seller agreed to effect late shipment by air at seller's expense. *Id.* at 195. Specifically, the parties agreed that the importer would make payment according to the original terms of the purchase orders and would later receive reimbursement from the seller for the difference between air and ocean freight. *Id.* Therefore, upon importation, the importer paid the FOB price and separately paid air freight. *Id.* at 196.

Customs appraised the entries at their invoice value, as opposed to the invoice value less the freight differential. *Id.* The importer appealed, maintaining that the agreement regarding the exporter's payment of the freight differential constituted a price discount in the amount of the

freight differential. *Id.* at 196–97. Rejecting the importer's arguments the court found that the evidence did not "support a finding that shipping was part of, or that price reductions were made to, the price actually paid or payable." *Id.* at 198. Accordingly, the proper transaction value was the invoice price without any deductions. *Id.*

### C. Persuasive Customs rulings addressing freight deductions

Customs has also issued several rulings interpreting the value statute in the context of late shipping clauses shifting freight responsibility. Those rulings provide persuasive guidance on what Customs examines when considering the availability of a freight deduction.

Initially, Customs treats the Incoterms displayed on shipping documents as important evidence of intent. If a shipping document displays FOB or a related Incoterm, Customs considers the FOB price to exclude freight and will not deduct freight charges. *See, e.g.*, HQ 548432 (May 20, 2004). But if a shipping document displays CFR or one of its variants, Customs considers the CFR price to include freight and often authorizes a freight deduction. *Id.* The purpose behind this practice is "to arrive at essentially an FOB or ex-factory price for the goods subject to appraisement." HQ 544646 (Dec. 23, 1991). Crucial to Customs's disparate treatment of those Incoterms, then, is its assumption that the CFR price *includes* freight.

Although Incoterms are helpful in deciphering the parties' intent, Customs has appropriately rejected blind reliance on the accuracy of those terms. For example, in HQ 545121 (Jan. 31, 1994), Customs considered a late shipment clause wherein seller was to air freight late goods at its own expense and importer was to reimburse seller in the amount of estimated sea freight for timely shipped goods. The parties agreed that the delivery terms would change on the invoice from FOB to CFR. Like in *Esprit*, the importer asserted that the late shipment agreement itself established a price discount for the late goods in the amount of the freight differential.

Customs disagreed, finding that (1) "the parties [did] not appear to contemplate a change in the price of the goods" and (2) no evidence "support[ed] a finding that freight charges were ever part of the price." *Id.* The only change was in "who will assume the additional shipping costs," and Customs noted that was insufficient to support a freight deduction even with a CFR notation. *Id.*

As that ruling suggests, Customs reasonably looks beyond Incoterms to the actual circumstances of the transaction governed by a late shipment agreement. As part of that holistic inquiry, Customs has asked three different questions: (1) whether "the price of the imported merchandise [was] renegotiated prior to the exportation of the merchandise"; (2) whether "the delivery terms [were] changed from FOB to [CFR]," and (3) whether "the [CFR] price includes freight charges." HQ 167196 (Jan. 20, 2012).

Customs answered those three questions affirmatively when examining a proposed late shipment clause in HQ 544911 (Apr. 6, 1993). The purchase order clause in that ruling expressly provided that a seller's failure to timely deliver merchandise would reduce the contract price by the difference between estimated ocean and air freight.[4] The importer noted that sometimes the price renegotiation may be reflected in a pre-shipment change of the delivery terms from FOB to CFR. Customs concluded that based on those facts, a freight offset would be warranted "assuming that the [CFR] renegotiated price does include freight charges." *Id.*

However, Customs rejected a freight deduction when reviewing a different late shipment clause in HQ 167196 (Jan. 20, 2012). The clause in that ruling authorized a late seller to ship late goods at their own expense via air freight CPT.[5] The importer asked Customs if it could

---

[4] In HQ 546422 (May 7, 1997), Customs addressed a similar price reduction clause, except that the clause appeared on either a commercial invoice or a letter of credit. Customs found that letters of credits and commercial invoices are not as closely tied to the purchase and sale of merchandise as the purchase orders and sales agreements. Thus, while a price reduction clause in a purchase order may offer sufficient evidence of intent to reduce the price, "providing such language on the L/C's or merely altering the terms of sale on a commercial invoice would not suffice as evidence of a price reduction."

[5] CPT or "carriage paid to" is the multi-modal equivalent of CFR. *Incoterms 2010*, at 33.

deduct air freight charges from its vendors' invoices in that scenario.  Finding that the importer could not, Customs distinguished its ruling in HQ 544911 on two grounds.  First, the late delivery clause in HQ 544911 "specifically stated that the contract price for the merchandise would be reduced by the difference between" estimated ocean and air freight.  *Id.*  Second, the invoices in HQ 544911 would have been changed prior to shipment to reflect the renegotiated price.  In sum, because there was no price reduction clause, there was no "evidence that the transacting parties actually contemplated and effected a reduction to the price actually paid or payable for the merchandise" and no way to conclude that the CPT price included freight.  *Id.*

### D.  Summary

As the statute, case law, and Customs rulings demonstrate, Incoterms help isolate the parties' intent, but they are not dispositive.  The use or non-use of the CFR acronym does not guarantee a freight deduction unless the importer proves with sufficient formality (for instance, by including an explicit price reduction clause) that freight was actually included in the price that the importer paid for the imported merchandise.  If the evidence does not on the aggregate demonstrate that shipment costs were part of buyer's total payment to seller, Customs will not (and, pursuant to 19 U.S.C. § 1401a(b)(4)(A), cannot) grant a freight offset.

## II.  The undisputed facts surrounding C&B's late shipments

Returning to the instant case, C&B argues that notwithstanding the contracting parties' apparent failure to update the shipping terms, the evidence shows that they "intended to effect an adjustment to the price actually paid or payable for the imported merchandise prior to exportation and that air freight charges for late shipments were part of that price."  Pl.'s Br. at 1.  C&B asserts that in light of this clear intent, it is immaterial whether the invoice terms of sale actually changed from FOB to CFR.  *Id.*

To evaluate C&B's arguments, it is necessary to examine the undisputed facts underlying their position. Those facts indicate that the seller was between twenty-two to twenty-eight days late in shipping 168 entries of apparel. Def.'s Br. at 11. The terms and conditions incorporated into C&B's purchase orders contemplated an incremental penalty in the case of late shipments:

> LATE SHIPMENT OF CONTRACT: Unless prior approval by Cutter & Buck is obtained, the results of late shipment of each contract due to factory error or cause . . . are:
> 1. 15-21 days late from agreed purchase order ship date vendor pays air charge ground freight. (This means the goods are altered and Cutter & Buck only pays the ocean portion of the total air freight bill.)
> 2. 22-28 days late- Vendor pays 100% [of] all freight via air using a freight company/forwarder of buyer's choice.
> 3. 29-34 days late- Point 2 above and the F.O.B. price paid per item will be reduced 10%. . . .

Pl.'s Br. at Ex. A. In compliance with the terms and conditions, seller shipped the late goods by air at its own expense. Pl.'s Facts ¶ 5. C&B then claimed a deduction based on the international freight costs provided by the seller. *Id.* ¶ 6.

Most of the entry documents for the 168 shipments identify FOB, FCA,[6] or something similar as the relevant shipping term.[7] *See* Def.'s Facts ¶ 12. However, the commercial invoices for thirty-nine of the 168 entries have FCA crossed out and CFR handwritten instead. *See* Def.'s Br. at 10 n.4. In addition to Incoterms, at least some commercial invoices quantify the actual freight costs and list them as a NDC or non-dutiable charge. Pl.'s Facts ¶ 6; Def's Resp. ¶ 6. Entry documents further indicate shipment via pre-paid air freight into Seattle. Pl.'s Facts ¶ 6.

---

[6] FCA or "free carrier" is the multi-modal equivalent of FOB. *Incoterms 2010*, at 23.

[7] The Incoterms contained on the shipping documents are not consistent. Approximately twenty-nine of the entries specify FOB as the shipping term. Def's Resp. to Plaintiff's Corrected Statement of Material Facts as to Which There Are No Genuine Issues to Be Tried ("Def.'s Resp.") ¶ 3. Twelve of those twenty-nine invoices are further qualified as "FOB by Air," which is an inappropriate use of the FOB Incoterm since FOB applies only to water transport. *See* Def.'s Br. at 10. A larger number contain the FCA Incoterm. Def.'s Resp. ¶ 3. And about thirty-nine of the entries have FCA crossed out and CFR hand-written instead. Def.'s Br. at 10 n.4.

### III.     The totality of the undisputed facts do not support C&B's position

C&B is correct that the Incoterm on a shipping document does not end the freight deduction inquiry. Rather, Customs looks at the circumstances of the transaction more holistically, while according due weight to the Incoterms appearing on the shipping documents. Based on a holistic review of the facts, the court agrees with the conclusion Customs reached in HQ 548432 and with the general principles underlying its ruling.

Initially, many of C&B's invoices identify FOB or FCA as the relevant shipping term, and those prices do not include freight. Customs has previously overlooked some typographical errors on shipping documents, but generally only when other documents specified CFR or a contrary intent was otherwise clear. And although certain commercial invoices in this case *did* contain a handwritten CFR designation, that is not dispositive. Indeed, Customs has previously concluded that "merely altering the terms of sale on a commercial invoice would not suffice as evidence of a price reduction." *See* HQ 546422.

More importantly, even if CFR had appeared on all the shipping documents, C&B has not demonstrated how that term reflected reality given the circumstances of its sales. Simply asserting that a transaction occurred on a CFR basis and that the invoice price included freight does not make it so. C&B needed to present corroborating facts supporting its assertions, especially since C&B paid the same price it would have paid had the goods been timely shipped on an FOB (freight-exclusive) basis. *See* Def.'s Facts ¶ 14. It may be that C&B and seller actually intended to reduce the purchase price by air freight *and* shift air freight responsibility, with the effect that the price C&B ultimately paid included freight. However, the undisputed facts before the court do not support that conclusion.

In fact, the primary document upon which C&B relies for support (the terms and conditions in the purchase order) actually supports the Government's position. As reproduced above, the terms and conditions call for different penalties depending on the length of the delay in shipping. According to the terms, the seller was responsible for 100 percent of the freight charges for shipments between twenty-two and twenty-eight days late. But for goods between twenty-nine and thirty-four days late, the seller incurred all freight charges and there was a corresponding reduction in the FOB price per item. While the twenty-nine to thirty-four day provision expressly called for an adjustment to the price actually paid or payable, the twenty-two to twenty-eight day provision clearly did not. Moreover, continued use of the FOB term contravenes C&B's argument that the terms of sale shifted to CFR. Although C&B argues that the twenty-nine to thirty-four day provision simply provided for another reduction, that argument does not find substantial support in any documentation before the court.

In sum, the applicable terms and conditions neither call for a price reduction for the 168 entries nor mandate a change in the shipment terms from FOB to CFR; the bulk of the shipping documents identify FOB or FCA as the relevant shipping term; and nothing on the record proves that the price C&B actually paid included shipping costs. When faced with this deficiency, the court cannot conclude that the totality of the circumstances support C&B's position. Instead, the evidence suggests that the exclusive penalty for these shipments was to relieve C&B of paying the freight charges it normally would have incurred for timely shipments. Accordingly, the requirements for a freight deduction under 19 U.S.C. § 1401a(b)(4)(A) were not satisfied and Customs properly rejected a freight deduction.

**CONCLUSION AND ORDER**

For the foregoing reasons, the court dismisses C&B's claims as they pertain to the five disputed entries covered by Protest No. 3001-03-100211 and, as to the remaining entries, sustains Customs's denial of C&B's attempted freight deduction.  Accordingly, it is hereby

**ORDERED** that the Government's Cross-Motion for Summary Judgment is granted;

**ORDERED** that C&B's Motion for Summary Judgment is denied; and

**ORDERED** that C&B's claims related to Entry Numbers WC4-5003386-3, WC4-5003406-9, WC4-5003501-7, WC4-5003502-5, and WC4-5003503-3 are dismissed for lack of jurisdiction.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated:  April 3, 2013
            New York, New York